JOHN H. MEGGISON, as Administrator of the Estate of Floyd J. Meggison, v. THE JAMES MAINE & SONS COMPANY, Appellant.

Negligence: BUILDING OPERATIONS: EVIDENCE. In this action for the death of a child while upon a public street, caused by the fall of a plank negligently knocked from or near the top of a hoisting tower by a cement bucket as it was being hoisted, the evidence is held to require submission of the question whether defendant was negligent in hoisting the bucket after it was too late in the day for the workmen to see where the bucket should be stopped.

Same: BUILDING OPERATIONS: NEGLIGENCE: DEGREE OF CARE. It will not be presumed from the simple granting of a permit to occupy a portion of a public street with material and machinery in the construction of a building, that more than a reasonable use of the street essential to that purpose was granted. And while travelers, including children, may not complain of such obstructions or of injuries sustained in coming in contact therewith, it is still the duty of the contractor to exercise care commensurate with the danger in using such instrumentalities. He will not be excused from liability for his negligence causing an injury and death by the fact that his material and machinery were by permission located in the street, but he is subject to the same rule of care which is exacted of owners of buildings abutting upon the street to guard against objects falling therefrom; that is the highest degree of care.

Same: DEATH OF MINOR: DAMAGES: EVIDENCE. In an action for the wrongful death of a minor, evidence of his father's trade and occupation is admissible, as tending to show what vocation the decedent would likely have followed but for his untimely death; and in the instant case evidence of the value of property accumulated by the father may have tended to corroborate his testimony as to his past earnings and was not prejudicial, especially as the amount of his cash in bank was developed on cross-examination.

Same: EVIDENCE: RELEVANCY.  Where it did not appear that dece-
dent, a young child, had gone in close proximity with the work or
machinery, the inquiry as to whether the father had cautioned him
to keep away from the men, teams and machines, was irrelevant
and properly refused.

*Appeal from Black Hawk District Court.*—HON. CHARLES E.
RANSIER, Judge.

SATURDAY, JUNE 7, 1913.

ACTION for damages resulted in judgment against de-
fendant, from which it appeals.—*Affirmed.*

*Dawley &, Wheeler* and *Edwards & Longley,* for ap-
pellant.

*W. N. Birdsall* and *C. W. Mullan,* for appellee.

LADD. J.—I. This action is by John H. Meggison, as
administrator of the estate of a deceased son, Floyd Meg-
gison, who while passing along Sycamore street in Waterloo
was struck and killed by a plank falling

1. NEGLIGENCE:
building oper-
ations : evi-
dence.

from or near the top of a tower one hundred
and thirty-three feet high. This tower was
about six and one-half feet square, and erected for the pur-
pose of lifting the concrete where needed as the construction
of the building progressed. Planks were nailed diagonally
about two feet apart on uprights, which were two inches by
six inches, with braces two inches by four inches. The bucket
was attached at one end of the cable and the other end run
through a pulley at the top and back to the hoisting engine,
and by it raised in the open space or hold of the tower.

The bucket was supposed to be heavier on one side than
it was on the other, and it rides a 2x6 made on purpose for
that business up to a certain point, then turns bottom side
and throws the contents out. If the bucket is carried say four
inches above the 2x6, it will tip bottom side up.

On November 16, 1910, cement was being lifted for the ceiling of the seventh story of the structure in course of construction, known as the First National Bank Building, and to accomplish this, the bucket was carried about one hundred and thirteen feet high. Ordinarily the engineer would observe the bucket so as to stop it when it emptied into the hopper, but toward evening Palmer directed its movement, and concerning the occurrence in issue testified:

I was watching the bucket and the man operating the engine was watching me for the signals. I recall the bucket that was being hoisted just before this accident. I was at that time standing in the same place and giving the same character of signals. When we started out with the bucket I watched it as long as I could watch it; then I lost track of it, and hollered to Mr. Boyd to shut it down; then I caught a glimpse of it again and told him to go ahead; the minute he started I couldn't see it again; then I knew something happened. I heard the crash and could feel a little cement coming down my way. I hollered, 'Look out boys, there is a plank falling.' I could see that on the outside of the tower, between that and the sky, anyway there was an object there I could see, and I hollered, 'Look out' and ran under the building. I think the plank that fell was the one that killed the boy. I saw him afterwards out in the street, where I went immediately. The plank was lying near the boy, The plank was knocked off just above the hopper. The plank was nailed across the tower, spiked across, and it was the swing of the bucket when it tipped that knocked the plank off of the tower. The bucket could not turn bottom side up unless it was hoisted above the 2x6 that held it in position, or unless it would catch something. I do not know how far above this 2x6 this plank spiked across the tower.

The negligence alleged was that defendant ''caused said hoisting apparatus to be operated at a time when it was impossible, by reason of darkness, to properly operate and control said hoisting engine, cable, and bucket, and by reason of such failure to properly control said hoisting apparatus, said plank was thrown from said tower.'' The hoisting en-

gine was on the sidewalk next the building being erected, which extended along the east side of Sycamore street one hundred feet and abutted Fourth street on the north eighty feet. At the south of the building was an alley ten feet wide, at which passage along the sidewalk was obstructed by a pile of brick. Near the center of the street was a pile of sand and other material, and opposite the tower was a concrete mixer and a platform on which cement was unloaded. Farther to the north a pile of hollow building tile extended out toward the center of the street. Prior to the day of the accident the west half of the street was unobstructed, and had been kept open for passage of pedestrians and vehicles. On the day previous the west side of the street was taken possession of, and excavations made for the city sewer, and material for that purpose hauled there. Several witnesses testified that a barricade was then placed across the street at or near the alley south of the building. As we understand it, this consisted of a four-inch by six-inch timber with ends on sewer tile, with another extending to the east side of the street resting on the curbing. Besides this, there was a sign nailed to a telegraph pole near the tower reading: "Danger, Keep Out. James Maine & Sons Co." On the other hand, several witnesses testified that they saw no barricade. Assuming, however, that there was a barricade, as testified to by some of the witnesses, it did not extend across the sidewalk, and pedestrians not only might but did pass by way of the sidewalk as far as the brickpile, and then out into the street by an open way to Fourth street, and of this defendant was fully aware.

The decedent, a boy under twelve years of age, had been at his father's saloon on Sycamore street a block or two south a few minutes, and being directed to go home so that his mother would know where he was, said "Good-bye, papa," and went along the street hauling a toy wagon. Whether he passed under the barricade, if any there was, or along the sidewalk and turned into the street near the brick pile, was

not shown. ·Wroten first saw the boy about eight or. ten feet
from the sidewalk on the east side of Sycamore street, and
from thirty to fifty feet north of the alley, immediately before
he was hit.  King testified that he had removed the east
timber, drove through with a load of cement, and proceeded
to unload it onto the platform, when Bell drove in with a
load of sand which he dumped, and, on driving out, replaced
the timbers; that he first noticed the boy standing in the street
while he finished unloading the cement, and as he got off the
wagon the plank came down.  Probably the boy was waiting
because of there not being room to pass between the wagon
and the sewer excavation.  The evidence was in sharp conflict
as to whether, owing to the lateness of the day, it was so
dark that Palmer and the engineer could not see to operate
the bucket in the tower safely.  No useful purpose will be
served by reviewing the evidence bearing thereon.  It is
enough to say that, even though the witnesses did not attempt
to say what objects could have then been seen at the top of
the tower, their evidence that it was dark, that the lights in
the stores and some in the street had been turned on, and with
reference to difficulty in identifying objects near by, was
enough to carry the issue as to whether it was too dark for
the operators to see where to stop the bucket to the jury.

II. · A permit to occupy one-half of the street with mate-
rials and machinery in the construction of the building ap-
pears to have been granted defendant, but its terms were not
2. SAME : building    proven.  It cannot be assumed to have gone
operations :          farther than to authorize such reasonable use
negligence : de-
gree of care.         of the street as was essential for this purpose,
and not to have excluded the public therefrom.  Travelers
might not have complained of these obstructions, nor of in-
juries occasioned by coming in contact therewith, and this
appears from the authorities cited by appellant to be the
rule even where children are injured thereby.  *Brown v.
Canning Co.*, 132 Iowa, 631; *Friedman v. Snare & Triest Co.*,

71 N. J. Law, 605 (61 Atl. 401, 70 L. R. A. 147, 108 Am. St. Rep. 764, 2 Ann. Cas. 497).

But this does not relieve the defendant from exercising care commensurate with the danger in using the instrumentalities temporarily located in the street, and if because of the negligent operation of the bucket in the tower injury resulted to plaintiff's intestate, causing his death, and this without fault on his part, recovery will not be denied because of the tower being in the street. Sycamore street was one of the principal thoroughfares of the city, and aside from defendant's actual knowledge that pedestrians were passing to and fro frequently, it was charged with notice that the street might be so used, and in the care and caution to be exercised by it to guard against injury to passing travelers the rule is not different from that exacted from the owners of buildings abutting on the highway in guarding against objects falling therefrom; that is, the highest degree of care is required. See *Connolly v. Des Moines Ins. Co.,* 130 Iowa, 633; *Dingley v. McDonald,* 124 Cal. 90 (56 Pac. 790); *Rosenhain v. Galligan,* 5 App. Div. 49 (38 N. Y. Supp. 713); *Atchison v. Plunkett,* 8 Kan. App. 308 (55 Pac. 677); *Butts v. National Exchange Bank,* 99 Mo. App. 168 (72 S. W. 1083). See *St. Louis Iron Mountain & Southern Ry. Co. v. Hopkins,* 54 Ark. 209 (15 S. W. 610, 12 L. R. A. 189); *Armbright v. Zion,* 108 Iowa, 338.

III. Plaintiff testified without objection that he had been a saloonkeeper eight years, and a bartender during four years previous. He was then allowed to testify over objection

3. SAME: death of minor: damages: evidence. that before being a bartender he had learned and followed the trade of a machinist for seven years, and that when he left the employment of the Illinois Central Railroad Company, his position was one of three general repair men doing all the roundhouse work. There was no error in this ruling. Such evidence is received as tending to show what vocation the decedent likely would have followed but for his untimely death, and what the parent formerly did might have some bearing

thereon. *Fischburn v. Ry Co.*, 127 Iowa, 483; *Eginore v. Union Co.*, 112 Iowa, 558; *Walters v. Ry. Co.*, 41 Iowa, 71. Such evidence is received, not only because of the influence the father may exert in the selection of a vocation by the son, but owing to possible inherited tendencies, and therefore the different employments of the parent throughout life may be proven.

The witness was also allowed to testify that he had acquired a home worth $4,000 or $5,000. This may have tended in some measure to corroborate the testimony as to the wages he had earned during the years past, and cannot be said to have been prejudicial error, especially in view of the circumstance that defendant brought out the fact on cross-examination that he also had $4,000 or $5,000 on deposit in a bank. This evidence might well have been omitted, but we are unable to see where it could have worked any prejudice to the defendant.

IV. On cross-examination plaintiff was asked whether he had ever told the decedent about attempting to go through Sycamore street where the building was being constructed, and whether he had cautioned him in passing through to keep away from the machines and the gang of men and teams doing work. An objection as incompetent, immaterial, and irrelevant was sustained. As the boy was not shown to have approached the gang of men and teams, nor to have come in close proximity to any machine, the objection was rightly sustained.

4. SAME: evidence: relevancy.

The instructions refused, in so far as correct, were embodied in those given, and, discovering no error in the record, the judgment is *Affirmed*.